IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:09-CV-00187-D

| | |
|---|---|
| NATIVE ANGELS HOMECARE AGENCY, INC., a North Carolina corporation, | ) ) ) ) |
| Plaintiff, v. | ) ) ) ) |
| KATHLEEN SEBELIUS, Secretary of the United States Department of Health and Human Services, in her official capacity, | ) ) ) ) ) ) |
| Defendant. | ) ) ) |

**MEMORANDUM & RECOMMENDATION**

This cause comes before the Court upon a motion for attorney fees and costs filed by Plaintiff Native Angels Homecare Agency, Inc. ("Native Angels"). (DE-34). Defendant Secretary of the United States Department of Health and Human Services, Kathleen Sebelius ("the Secretary") has responded (DE-37), Native Angels has replied (DE-38), and the matter is accordingly ripe for adjudication. In accordance with 28 U.S.C. § 636(b)(3), the motion was referred to the undersigned for entry of a memorandum and recommendation. (DE-40). For the reasons stated herein, the undersigned recommends that the motion for attorney fees and costs (DE-34) be GRANTED.

I. **BACKGROUND**

Native Angels, a North Carolina corporation, is a Medicare-certified hospice provider based in Robeson County, North Carolina. Native Angels provides hospice services to

terminally ill Medicare beneficiaries. In connection with its hospice services, Native Angels submits Medicare claims and receives Medicare payments.

The United States Department of Health and Human Services ("HHS") is the federal agency that administers Medicare and reimburses hospice providers for services rendered to Medicare beneficiaries in accordance with 42 U.S.C. §§ 1395 *et seq.*, the Medicare Act. The Medicare Act caps total reimbursement payments hospice care providers may receive from Medicare in any given fiscal year, calculated based on the number of individual patients treated in that fiscal year multiplied by the individual patient cap amount. The relevant hospice-care statute within the Medicare Act provides:

> (A) The amount of payment made under this part [42 U.S.C. §§ 1395 *et seq.*] for hospice care provided by (or under arrangements made by) a hospice program for an accounting year may not exceed the "cap amount" for the year (computed under subparagraph (B)) multiplied by the number of medicare beneficiaries in the hospice program in that year (determined under subparagraph (C)).
> . . . .
> (C) For purposes of subparagraph (A), the "number of medicare beneficiaries" in a hospice program in an accounting year is equal to the number of individuals who have made an election under subsection (d) with respect to the hospice program and have been provided hospice care by (or under arrangements made by) the hospice program under this part in the accounting year, *such number reduced to reflect the proportion of hospice care that each such individual was provided in a previous or subsequent accounting year* or under a plan of care established by another hospice program.

42 U.S.C. § 1395f(i)(2) (emphasis added). The statute requires an annual recalculation of the individual patient "cap amount" based on changes in the Consumer Price Index. *See id.* at § 1395f(i)(2)(B). In enacting 42 U.S.C. § 1395f(i)(2), Congress did not specify a methodology as to how "the number of medicare beneficiaries" should be "reduced to reflect the proportion of hospice care that each such individual was provided in a previous or subsequent accounting year[,]" but instead directed HHS to promulgate the necessary regulations to implement the

Medicare hospice benefit and the annual aggregate cap amount set forth in 42 U.S.C. § 1395f(i)(2).

In 1983, HHS promulgated 42 C.F.R. § 418.309 ("the challenged regulation"), a regulation purporting to implement 42 U.S.C. § 1395f(i)(2). The challenged regulation provides in relevant part:

> For purposes of [the cap amount] calculation, the number of Medicare beneficiaries includes—
> (1) Those Medicare beneficiaries who have not previously been included in the calculation of any hospice cap and who have filed an election to receive hospice care, in accordance with § 418.24, from the hospice during the period beginning on September 28 (35 days before the beginning of the cap period) and ending on September 27 (35 days before the end of the cap period).

42 C.F.R. § 418.309(b).[1]

Thus, the challenged regulation deals with patients whose hospice care stay extends into more than one fiscal year by using a single-year allocation method—allocating each individual patient cap amount to a single fiscal year based upon the date on which the patient elects for hospice care—rather than a proportional allocation method. A proportional method would allocate each individual patient cap amount to different fiscal years based on the exact proportion of care received by a patient in each relevant fiscal year. Under the challenged regulation's single-year approach, a patient who elects to receive hospice care on or before September 27, 2005, would be counted as receiving care only in fiscal year 2005, even if the patient continues to receive hospice care in fiscal year 2006. A patient who elects to receive hospice care on September 28, 2005, however, would be counted as receiving care only in fiscal year 2006, even though he may have started receiving hospice care during fiscal year 2005.

---

[1] 42 C.F.R. § 418.309(b) has since been amended, effective October 1, 2011. *See* 76 Fed. Reg. 47302, 47332 (Aug. 4, 2011).

On November 18, 2009, Native Angels filed a complaint in this Court against the Secretary, seeking declaratory and injunctive relief. (DE-1). In so doing, Native Angels joined dozens of other hospice-care providers who over the past several years have filed lawsuits nationwide challenging the validity of the Secretary's single-year allocation method of calculation prescribed by 42 C.F.R. § 418.309(b)(1).[2] Like other hospice-care providers, Native Angels asserted that 42 C.F.R. § 418.309(b)(1) was contrary to Congress' statutory mandate under 42 U.S.C. § 1395f(i)(2)(C) and should be declared invalid. On April 23, 2010, Native Angels moved for summary judgment on the validity of the challenged regulation. (DE-14).

Upon review, this Court agreed with Native Angels that the calculation method set forth in 42 C.F.R. § 418.309(b)(1) "contradicts Congress' express requirement that the Medicare-beneficiary calculation include proportional allocation for an individual beneficiary among accounting years." (DE-24, p.11). The Court determined the challenged regulation was invalid and therefore granted summary judgment in favor of Native Angels.[3] (*Id.* at p.12).

The Secretary initially appealed the order of the district court to the United States Court of Appeals for the Fourth Circuit (DE-29) but thereafter filed a stipulated motion to dismiss the appeal (DE-32). As the prevailing party, Native Angels now seeks attorney fees and costs under 28 U.S.C. § 2412(d).

## II. LEGAL BACKGROUND

---

[2] *See, e.g.*, Lion Health Serv., Inc. v. Sebelius, 635 F.3d 693 (5th Cir. Mar. 11, 2011); Mission Hospice, LLC v. Sebelius, No. CIV-10-0897-HE, 2011 U.S. Dist. LEXIS 85617, at *5-6 (W.D. Okla. July 29, 2011) (listing cases nationwide).

[3] Judge Dever's order granting summary judgment (DE-24) contains a complete analysis of the challenged regulation at issue. The undersigned determines that the Court's discussion need not be reproduced in its entirety for purposes of the instant memorandum and recommendation, but the undersigned will refer to the summary judgment order as necessary to support the recommendation.

The Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412, provides that parties who prevail in litigation with the United States are entitled to reimbursement of reasonable attorney fees "unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C. § 2412 (d)(1)(A); *accord* Roanoke River Basin Ass'n v. Hudson, 991 F.2d 132, 138 (4th Cir. 1993). The award of attorney fees to a prevailing party, therefore, "is mandatory *unless* the government can demonstrate that its position was 'substantially justified,'" EEOC v. Clay Printing Co., 13 F.3d 813, 815 (4th Cir. 1994), or that special circumstances make an award unjust.

To determine whether the government's position "was substantially justified," the court considers the reasonableness of the government's stance during the litigation as a whole. *See, e.g.*, Commissioner, INS v. Jean, 496 U.S. 154, 161 (1990) (the court must consider "all aspects of the civil action"); Cody v. Caterisano, 631 F.3d 136, 141 (4th Cir. 2011) (same). As the Fourth Circuit has explained:

> The EAJA was enacted to address Congress' concerns with civil actions in which the government is litigating against private parties whose resources are substantially outweighed by those of the government. Absent a potential right for reimbursement of litigation expenses, a private litigant might be coerced to agree to orders that represent an unreasonable exercise of government power and reflect an erroneous or inaccurate application of an agency rule of general application. It was anticipated that, by providing a mechanism for leveling the playing field, not only would access by private litigants to the courts and administrative proceedings be facilitated, but also the public interest would be served by insuring, through a more balanced adversarial process, that only reasonable governmental positions on policy and rules would be enforced. Moreover, it is clear that Congress intended to address governmental misconduct whether that conduct preceded litigation, compelling a private party to take legal action, or occurred in the context of an ongoing case through prosecution or defense of unreasonable positions.

Roanoke River Basin Ass'n, 991 F.2d at 138 (citations omitted).

Thus, in the context of the EAJA, the phrase "substantially justified" does not mean "'justified to a high degree,' but rather 'justified to a degree that could satisfy a reasonable person.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988). In short, the court

> look[s] beyond the issue on which the petitioner prevailed to determine, from the totality of the circumstances, whether the government acted reasonably in causing the litigation or in taking a stance during the litigation. In doing so, it is appropriate to consider the reasonable overall objectives of the government and the extent to which the alleged governmental misconduct departed from them.

Roanoke River Basin Ass'n, 991 F.2d at 139. It is the government's burden to demonstrate that its position was substantially justified. Crawford v. Sullivan, 935 F.2d 655, 658 (4th Cir. 1991).

### III. ANALYSIS

#### A. Eligibility for EAJA Fees

As an initial matter, the Secretary contends Native Angels has failed to show eligibility for attorney fees under the EAJA. Specifically, the Secretary argues there is insufficient evidence that, as a corporation, Native Angels meets the EAJA's definition of a "party" qualified to seek attorney fees. To qualify as a "party" under the EAJA, a corporation may have no more than five hundred employees and a net worth of less than $7,000,000 at the time the civil action is filed. See 28 U.S.C. § 2412(d)(2)(B)(ii). However, Native Angels has submitted several affidavits by Bobbie Jacobs-Ghaffar, the president and CEO of Native Angels, attesting that at the time the civil action was filed, Native Angels employed less than five hundred persons and had a net worth well under the seven million dollar limit. (DE-39, DE-17-2). Demonstrating net worth for the purposes of the EAJA is not a high evidentiary hurdle. See Broaddus v. United States Army Corps of Eng'rs, 380 F.3d 162, 169 (4th Cir. 2004) ("[W]e agree with our sister circuits who have held that a determination of eligibility for EAJA fees should not result in a

second trial, and that some informality of proof should be allowed."). The undersigned considers the evidence sufficient to demonstrate that Native Angels is a "party" for purposes of the EAJA.

B. **Substantial Justification**

Native Angels contends the Secretary's position during the instant litigation was not substantially justified and that attorney fees are therefore warranted. When HHS enacted the challenged regulation, the agency understood that the Medicare Act required the "number of beneficiaries" in an accounting year for cap purposes to be "reduced to reflect the proportion of hospice care that each such individual was provided in a previous or subsequent accounting year." *See* 42 U.S.C. § 1395f(i)(2)(C). HHS, however, promulgated a contrary regulation that "count[ed] each beneficiary only in the reporting year in which the preponderance of the hospice care would be expected to be furnished rather than attempting to perform a proportional adjustment." *See* 48 Fed. Reg. at 38,158; *see also* 42 C.F.R. § 418.309(b)(1). When it proposed the challenged regulation, HHS acknowledged that:

> Although section 1814(i)(2)(C) of the [Medicare] Act specifies that the cap amount is to be adjusted "to reflect the proportion of hospice care that each such individual was provided in a previous or subsequent accounting year . . .", such an adjustment would be difficult in that the proportion of the hospice stay occurring in any given year would not be known until the patient died or exhausted his or her hospice benefits. We believe that the proposed alternative of counting the beneficiary in the reporting period where the beneficiary used most of the days of covered hospice care will achieve the intent of the statute without being burdensome.

48 Fed. Reg. 38146, 38,158 (Aug. 22, 1983) [hereinafter "1983 commentary"]. This comment, Native Angels asserts, indicates HHS knew it was not following the letter of the statute in enacting the challenged regulation but instead was striving for administrative convenience. Native Angels contends that "HHS' promulgation of a regulation when HHS was aware that it violated Congress' express mandate is not reasonable in either law or fact." (DE-35, p.8).

The Secretary responds that her litigation position was reasonable, given what HHS perceived as terms of ambiguity in the Medicare hospice cap statute. In the memorandum in support of her motion for summary judgment, the Secretary argued that this ambiguity afforded her discretion in determining the best method to serve the purpose of avoiding the double-counting of Medicare beneficiaries whose time as hospice patients straddled more than one fiscal year. (DE-20). The Secretary asserts she reasonably believed that the challenged regulation was a valid and permissible implementation of the intent of the hospice cap statute. Although her argument did not prevail, the Secretary contends her position in defending the civil action was nonetheless substantially justified. Because her position was substantially justified, the Secretary contends an EAJA award is not warranted.

The undersigned agrees with Native Angels that the Secretary's position was not substantially justified. Courts considering the issue have overwhelmingly rejected the Secretary's arguments regarding the purported ambiguity of 42 U.S.C. § 1395f(i)(2). *See* Mission Hospice, No. CIV-10-0897-HE, 2011 U.S. Dist. LEXIS 85617, at *5 (noting that "all the decided cases appear to support plaintiffs['] challenge to the validity of 42 C.F.R. § 418.309(b)"). Indeed, in deciding the cross-motions for summary judgment, Judge Dever eviscerated the Secretary's arguments:

> Here, the court initially addresses whether Congress has directly spoken to whether the number of Medicare beneficiaries may be calculated, for purposes of hospice-provider reimbursement, in the manner that 42 C.F.R. § 418.309(b)(l) requires. If the intent of Congress is clear in the statute, the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. Moreover, ease of agency administration does not authorize an agency to ignore "the administrative structure that Congress enacted into law." Ragsdale v. Wolverine World Wide, 535 U.S. 81, 91 (2002) (quotation omitted).
>
> . . . .

> The statute requires that when calculating the number of Medicare beneficiaries for a hospice provider in a fiscal year, the number of beneficiaries should be "reduced to reflect the proportion of hospice care that each such individual provided in a previous or subsequent accounting year . . . ." See id. Thus, if a beneficiary received hospice care for only part of the year, the number of beneficiaries must be proportionally reduced for purposes of calculating the hospice provider's "cap amount."
>
> . . . .
>
> Despite the statutory language of 42 U.S.C. § 1395f(i)(2)(C), 42 C.F.R. § 418.309(b)(1) fails to "reduce[] [the number of Medicare beneficiaries] to reflect the proportion of hospice care that each . . . individual was provided in a previous or subsequent accounting year." 42 U.S.C. § 1395f(i)(2)(C). Rather, the regulation includes a Medicare beneficiary in a fiscal year based upon the date that the beneficiary elects to receive hospice care. This calculation method directly contravenes Congress' express intent by not allocating Medicare benefits on an individual basis, by not allocating benefits across years of service, and by not providing benefits for years of care subsequent to the fiscal year during which a Medicare beneficiary elects to receive hospice care. See, e.g., Russell-Murray Hospice, Inc., 2010 WL 2814414, at *11-13; Hospice of N.M., LLC, 691 F. Supp. 2d at 1288-93. Accordingly, the regulation's calculation method contradicts Congress' express requirement that the Medicare-beneficiary calculation include proportional allocation for an individual beneficiary among accounting years. Compare 42 U.S.C. § 1395f(i)(2)(C), with 42 C.F.R. § 418.309(b)(1); see, e.g., Russell-Murray Hospice. Inc., 2010 WL 2814414, at *12-13; Hospice of N.M.. LLC, 691 F. Supp. 2d at 1288-93.
>
> In light of the plain language of 42 U.S.C. § 1395f(i)(2)(C), Congress has "directly spoken" to the "precise question," and regulation 42 C.F.R. § 418.309(b)(1) conflicts with Congress' mandate. See, e.g., Russell-Murray Hospice. Inc., 2010 WL 2814414, at *12-13; Hospice of N.M.. LLC, 691 F. Supp. 2d at 1288-92. As such, the regulation is invalid, and Native Angels is entitled to summary judgment on this issue. See, e.g., Russell-Murray Hospice. Inc., 2010 WL 2814411, at *11-14; Hospice of N.M.. LLC, 691 F. Supp. 2d at 1284-86 (collecting cases from various district courts invalidating 42 C.F.R. § 418.309 (b)(1)). Thus, the court grants Native Angels' summary judgment motion [D.E. 14] as to its claim that 42 C.F.R. § 418.309(b)(1) is invalid and contrary to law, and denies the Secretary's cross motion as to 42 C.F.R. § 418.309(b)(1) [D.E. 19].

(DE-24, pp.8-12).

Such uniform and decided rejection by the courts of the Secretary's arguments exposes the weakness of her litigation position and casts serious doubts as to her good faith belief in the likelihood of a successful defense. To be sure, the EAJA was never intended to "chill the

government's right to litigate," Roanoke River Basin Ass'n, 991 F.2d at 139, and the government may often "take a position that is substantially justified, yet lose." Pierce, 487 U.S. at 569. "Nevertheless, a string of losses can be indicative" of whether the government's position was substantially justified. *Id.* Here, the losses sustained by the Secretary in courts nationwide persuasively indicate that the government's position was not "reasonably substantiated." Roanoke River Basin Ass'n, 991 F.2d at 139.

However, the undersigned believes the true "smoking gun" demonstrating lack of substantial justification for the Secretary's position lies in the 1983 commentary issued by HHS prior to 42 C.F.R. § 418.309(b)(1)'s promulgation. In the 1983 commentary, HHS conceded that the proposed regulation contradicted 42 U.S.C. § 1395f(i)(2)(C), but explained the agency was opting to disregard Congress' mandate because implementation of a proportional adjustment "would be difficult" and "burdensome." Yet "[r]egardless of how serious the problem an administrative agency seeks to address," FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 125 (2000), "ease of agency administration does not authorize an agency to ignore 'the administrative structure that Congress enacted into law.'" Summary Judgment Order, DE-24, p.8 (quoting Ragsdale v. Wolverine World Wide, 535 U.S. 81, 91 (2002)). To openly announce that a proposed regulation violates a statute, only to implement and then aggressively defend such a regulation from nationwide challenges, seems the height of arrogance and administrative hubris. Indeed, it is difficult to conceive of a better example of the "unreasonable exercise of government power." Roanoke River Basin Ass'n, 991 F.2d at 138.

The undersigned therefore concludes the Secretary has failed to sustain her burden of demonstrating that her position was substantially justified. The undersigned finds no exceptional or "special circumstances" present in the instant case to excuse the lack of substantial

justification for the Secretary's position. Nor does the undersigned consider an award of attorney fees unjust under the circumstances presented here. The undersigned therefore recommends an award of attorney fees in favor of Native Angels.

## C. Rate of Attorney Fees Awarded

The undersigned now considers the question of the amount of attorney fees to recommend. Under § 2412(d)(2)(A) of the EAJA, "fees and other expenses" awarded to a prevailing party in a civil action against the government must be "reasonable." 28 U.S.C. § 2412(d)(2)(A). The statute specifically provides a maximum hourly rate to be awarded:

> The amount of fees awarded . . . shall be based upon prevailing market rates for the kind and quality of the services furnished, except that . . . attorney fees shall not be awarded in excess of $125 per hour *unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee.*

*Id.* (emphasis added). An enhanced hourly rate above the statutory maximum should be awarded "in very limited circumstances." Hyatt v. Barnhart, 315 F.3d 239, 249 (4th Cir. 2002) (unpublished). The court must find that an increase in the cost of living or a "special factor" justifies a fee higher than the maximum hourly rate. *Id.* In Hyatt, the Fourth Circuit cautioned that

> [t]he mere fact that there is a short supply of lawyers skilled and experienced enough to handle the case is not a "special factor." *See Pierce*, 487 U.S. at 571-72. Rather, "the 'special factor' formulation suggests Congress thought that [$ 125] an hour was generally quite enough public reimbursement for lawyers' fees, whatever the local or national market might be." *Id.* at 572.
> In order to establish that the "limited availability of qualified attorneys for the proceedings involved" is a "special factor" justifying a fee in excess of the hourly cap, the prevailing party must show that their "attorneys had some distinctive knowledge or specialized skill needful for the litigation in question--as opposed to an extraordinary level of the general lawyerly knowledge and ability useful in all litigation." *Id.*
> Specific examples of this requisite "distinctive knowledge or specialized skill" cited by the Court include "an identifiable practice specialty such as patent law, or knowledge of foreign law or language." *Id.* But, examples of purported

> "special factors" specifically rejected by the Court are also instructive. They include "the novelty and difficulty of issues, the undesirability of the case, the work and ability of counsel, and the results obtained," all of which the Court considered to be "little more than routine reasons why market rates are what they are." *Id.* at 573 (internal quotation marks omitted). The "customary fees and awards in other cases" was also rejected as a special factor. *Id.* (internal quotation marks omitted).

*Id.*

The Fourth Circuit in Hyatt declined to find the existence of a "special factor" in the absence of "exceptional or specialized education or training beyond the diligent study and practice required of any practice speciality." *Id.* at 252.

Native Angels contends it deserves an hourly rate above the statutory maximum because its attorneys are successful members of a healthcare regulatory practice group that handles Medicare administrative appeals and cases. However, this does not appear to be the type of "exceptional or specialized education or training beyond the diligent study and practice required of any practice speciality" required for an enhanced award. Hyatt, 315 F.3d at 252; *see also* Healey v. Leavitt, 485 F.3d 63, 69 (2nd Cir. 2007) (finding no justification for an enhanced fee under the EAJA because "[t]he attorneys here, while indisputably experienced in the practice of Medicare law, do not possess '*distinctive* knowledge or *specialized* skill *needful* for the litigation in question.'") (quoting Pierce, 487 U.S. at 572) (emphases in original)). The undersigned therefore declines to recommend enhanced attorney fees based on the presence of a "special factor."

Native Angels argues alternatively that the Court should adjust the statutory rate to reflect cost of living increases. According to Native Angels' calculations, supported by affidavit (DE-36, p.5), a cost of living adjustment would result in an hourly rate of $172.75. The Secretary offers no evidence to rebut Native Angels' calculation but simply requests the Court "award an hourly attorneys' fee rate of no more than the $172.75 sought with the cost of living adjustment."

(DE-37, p.10). The undersigned considers a cost of living adjustment under the EAJA appropriate and therefore recommends that Native Angels be awarded attorney fees at an hourly rate of $172.75. The undersigned moreover rejects the Secretary's contention that any award of attorney fees should be withheld to offset Native Angels' outstanding federal debt.

However, the Secretary correctly notes that the total number of attorney hours claimed by Native Angels includes work performed both by attorneys and paralegals. Specifically, of the 435.9 hours of work performed on the case, 80.9 hours represent paralegal services. (DE-36, Exh.A, p.15). Although Native Angels may recover for paralegal services under the EAJA, *see* Richlin Sec. Serv. Co. v. Chertoff, 553 U.S. 571, 590 (2008), the Secretary argues that the hours claimed for paralegal work should be awarded at the prevailing market rate for paralegal services rather than the hourly attorney rate. The undersigned agrees and recommends that the total number of attorney hours be reduced by the 80.9 hours of paralegal services, resulting in an award based on 355 hours of attorney work. The undersigned recommends awarding the remaining 80.9 hours of paralegal service at the prevailing market rate for paralegal services. Within ten days of the entry of this memorandum and recommendation, the parties should submit evidence of the prevailing market rate for paralegals. The undersigned will determine at that time the appropriate recommended award for the outstanding 80.9 hours worth of paralegal work performed in the instant litigation.

## IV. CONCLUSION

For the foregoing reasons, it is hereby RECOMMENDED that Plaintiff Native Angels' motion for attorney fees and costs (DE-34) be GRANTED. The undersigned RECOMMENDS Native Angels be awarded $61,326.25 in attorney fees and $9,981.41 in costs. The undersigned directs the parties to submit evidence of the prevailing hourly rate for paralegal services no later

than ten days from the entry of this memorandum and recommendation. The undersigned will then recommend a further award for the outstanding 80.9 hours of paralegal services Native Angels is entitled to recover.

SO RECOMMENDED in Chambers at Raleigh, North Carolina this 22nd day of September, 2011.

WILLIAM A. WEBB
UNITED STATES MAGISTRATE JUDGE